ROBERT C. ATKINSON, Appellant, v. THE ILLINOIS MILK COMPANY, Respondent.

St. Louis Court of Appeals, February 24, 1891.

Negligence : PEREMPTORY INSTRUCTION. When an issue of fact, as to whether a party has been guilty of negligence, is tried, a peremptory instruction directing the jury to find that there was negligence is not proper, unless the conceded facts, or the testimony of such party, is such that no other conclusion could reasonably be drawn therefrom by a fair-minded man. And *held* that the evidence in this case did not call for such an instruction, or render erroneous a finding for the party charged with the negligence.

*Appeal from the St. Louis City Circuit Court.*—HON. DANIEL D. FISHER, Judge.

AFFIRMED.

*W. C. Marshall*, for appellant.

Plaintiff had a right to leave his horse securely fastened on the public street, while in the prosecution of his profession of a practicing physician. He was guilty of no negligence, either direct or contributory. The defendant was guilty of negligence which was the proximate cause of the damages suffered by the plaintiff, and is, therefore, liable in this action. *Schaabe v. Wheel Co.*, 56 Mo. 173 ; *Morrissey v. Ferry Co.*, 43 Mo. 383. It was negligence to drive, at a high rate of speed, down hill, so close to plaintiff's horse, that, to prevent the horses' heads from colliding, the defendant's horse had to be suddenly turned aside. Such surroundings would tend, naturally, to frighten a rational being, *a fortiori* a dumb beast. *Urquhart v. Boutel*, No. 2981, Court of Appeals.

*Andrew Mackay, Jr.*, for respondent.

Biggs, J.—This is an action for damages for negligence. The case was tried by the court sitting as a jury ; the court gave a verdict and judgment for the defendant ; and the plaintiff prosecutes this appeal. No exceptions were saved to any rulings of the court, and no instructions were asked or given.

The plaintiff insists that the judgment is wrong under the conceded facts in the case.

It may be stated as a correct legal proposition, that where the facts are conceded, and the negligence imputed is a conclusion of fact, not a conclusion of law, yet where fair-minded men could not differ as to the conclusion that the inference of negligence ought to be drawn, the court ought to direct the jury to draw it. It is upon this principle that the plaintiff plants himself, and insists that under the evidence no other reasonable conclusion can be drawn, than that the defendant was negligent and that its negligence was the proximate

cause of his damage. This view has been pressed upon our attention by the plaintiff's counsel with great earnestness and ability.

Where the question of negligence is purely one of fact, to justify the court in directing the jury to draw the inference of negligence, it is not sufficient that the plaintiff's evidence bearing on the question is undisputed, for the reason that the credibility of his witnesses is a question for the jury. The conceded facts or the defendant's own testimony must warrant it. Hence, in this case, if the plaintiff's theory is to prevail, it must appear from the defendant's evidence, that no other conclusion could reasonably be reached, than that the driver of its wagon was negligent, and that such negligence was the proximate cause of the plaintiff's damage.

The plaintiff is a physician, and drove, in making his professional calls, a young and spirited horse, which he had owned about a month. In making a visit to a patient, he hitched the horse on the side of the street to a telegraph pole by means of a strap. The plaintiff introduced evidence tending to prove that a milk wagon belonging to the defendant was driven along at a rapid rate ; that the horse attached to the wagon, and the wagon itself, were decorated with flags, it being a day known as "Centennial day ; " and that the horse and wagon were driven so near the plaintiff's horse that the latter took fright, broke loose and ran away, and smashed the plaintiff's buggy to pieces.

The plaintiff testified : "I had been driving him (the horse) thirty days, and had no trouble with him whatever. He was a young horse, that is, seven years of age, active and spirited, and of course the kind of a horse you have got to watch. You have to hold on to him when driving him."

It may be well to state at this point that the plaintiff was in no way negligent in leaving his horse hitched on the side of the street. The evidence had no tendency

to show that he was an animal of such wild and unruly traits, as to require the constant personal attention of some one. Therefore, we may lay out of view all questions of contributory negligence.

The defendant introduced one witness. He testified that he was on the milk wagon with the driver. He said: "We drove up from the south, and I saw the doctor's horse. I didn't know whose it was. I saw the horse and buggy hitched to the telegraph pole. This telegraph pole is about in the middle of the two premises, where it might be the dividing line. Now, in order to get the wagon opposite the gate where the milk had to be delivered, on account of some gas pipe and dirt lying there, the driver kept in the middle of the street. * * *.

"*Q.* State about what gait the driver drove. *A.* He drove in an ordinary gait.

"*Q.* In a trot? *A.* Drove in a trot; yes, sir.

"*Q.* About how fast was he going? *A.* Well, he was going on a slow trot; nothing out of the way; nothing fast, because the horse don't run very fast.

"*Q.* Are you a judge of speed as to whether a horse is going four miles or six miles? *A.* I don't think that horse could have made more than four miles anyhow, because it was out on the early trip. The horses go two trips. Of course there was a hill there, and that might help the speed of the horse, because it was going down grade.

"*Q.* How near was he in front of the premises before he began to check up his horse? *A.* Well, he had to commence checking up his horse as soon as he got to the house here; commenced to check up as soon as he got to the house * * *.

"*Q.* Now, you say the ground had been torn up there making some repairs. About how far was it from the curb out to where the wagon stopped? *A.* Well, it stopped right in the middle of the street; that must have made it four or five feet at leas

"*Q.* And you think the horses' heads were about three feet apart when you checked up? *A.* Yes, sir.

"*Q.* About how many flags were on the horse? *A.* Well, about six or eight of those small flags.

"*Q.* Any on the wagon? *A.* Yes, sir, there was a flag on the wagon.

"*Q.* What about rosettes? *A.* The horse had two rosettes; one on each side.

"*Q.* You say he began to check up as soon as he got to the horse? *A.* Yes, sir.

"*Q.* It was some thirty feet before he stopped? *A.* Yes, sir.

"*Q.* How fast was he going just immediately before stopping? *A.* Well, I don't think he was going more than four miles an hour.

*Q.* Now just as he stopped how fast was he going? *A.* In a trot.

"*Q.* Still trotting? *A.* Well, he had ceased trotting; of course, after he stopped him he didn't trot any more. Wasn't trotting when he stopped him.

"*Q.* But just before stopping was he trotting? *A.* No, sir; because he slacked up.

"*Q.* Did he pull up suddenly or check him up gradually? *A.* He checked him up gradually.

"*Q.* When did you first notice that the doctor's horse was frightened or frightening at your approach? *A.* After we stopped, then the doctor's horse began to jerk back on the hitching strap. I didn't think, or I could have jumped out and stopped him if I had thought anything would happen. Of course we see a horse jerk back on a bridle, and we don't think of it, and he was standing still all the time. We had completely stopped before the horse jerked.

"*Q.* Did he act as though he was frightened before you stopped? *A.* No, sir * * *.

"*Q.* The heads (of the horses) never came together? *A.* No, sir; never touched their heads.

"*Q.* It was about two feet apart north and south, and your horse's head was about three feet further east than the doctor's horse's head? *A.* Yes, sir ; he never touched our wagon, and neither did we touch his."

The foregoing is the substance of the witness' testimony. It was stipulated that, if the driver were present, he would testify to the same facts.

It cannot be maintained, and we do not understand that the plaintiff's counsel so contends, that the decoration of the horse and wagon with flags amounted to negligence. The reasonable exercise of this and kindred rights must be accorded to all citizens on occasion of national holidays or festivities. All persons must expect this, and govern themselves accordingly. The plaintiff's right of recovery, therefore, must grow out of the manner of driving the wagon.

We have listened to two oral arguments in this case, and have had the benefit of very satisfactory briefs. We are unable, however, to divest our minds of the conclusion arrived at in the first instance. We cannot read the defendant's side of the case without concluding that the two questions of fact, upon which its liability depends, are fairly debatable. Its evidence tended to show that the horse in the milk wagon approached the plaintiff's horse in a walk, and that, when the wagon came to a full stop, the head of the defendant's horse was two feet south and three feet east of the head of the plaintiff's horse. Whether this had a natural tendency to frighten an ordinarily gentle horse, properly hitched on the side of the street, was in our opinion a question of fact for the jury.

But, if this question were conceded, there is another lying behind it, the determination of which, under the facts, ought to be left to the jury. We have reference to the proximate cause of the injury. The plaintiff says that his horse was young and spirited, and that he was an animal that had to be watched. This opened the door for the argument, that the "proximate cause"

might have been the timidity of the plaintiff's horse. If we were the triers of the fact, we probably would not so hold, but we cannot go beyond this, and say, that fair-minded men could not differ on the question.    This is the test that must be applied.

The judgment of the circuit court must be affirmed. All the judges concur.